**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and** | ) | |
| **PEOPLE OF THE VIRGIN ISLANDS,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Criminal Action No. 2011-030** |
| **ROY HENRY, JR.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
**Allan F. John-Baptiste, Esq.,**
St. Croix, U.S.V.I.
 *For the Government*

**Yohana M. Manning, Esq.,**
St. Croix, U.S.V.I.
 *For the Defendant*


<u>**MEMORANDUM OPINION**</u>

**Lewis, District Judge**

 THIS MATTER is before the Court on Defendant's Motion to Suppress and Supplemental Motion to Suppress, which were filed on December 7, 2011, and January 12, 2012, respectively. (Dkt. Nos. 17 & 39).  The Government filed its Opposition to these Motions on January 26, 2012.  (Dkt. No. 43).  An evidentiary hearing on this matter was held on April 10 and 11, 2012.  On April 30, 2012, Defendant filed a supplemental brief regarding his "standing" as an "overnight guest" to raise a Fourth Amendment challenge to the search, (Dkt. No. 77), and the Government filed a supplemental opposition on May 7, 2012 (Dkt. No. 78).  For the reasons discussed below, the Court will deny Defendant's Motions.

# I.    BACKGROUND[1]

## A.  The Search Warrant Affidavit

On February 23, 2011, Virgin Islands Superior Court Judge Darryl Donahue issued a search warrant for Apartment 195 of Building 31 of the John F. Kennedy Housing Community ("Apartment 195").  (*See* Crim. Case. No. 2011-06, Dkt. No. 161-3).[2]  The search warrant was based entirely on the affidavit of Sergeant Dino Herbert (the "Herbert Affidavit") of the Virgin Islands Police Department (VIPD). (*See* Dkt. No. 39-1).  The Herbert Affidavit stated as follows:

1.  On February 2, 2011, Sgt. Herbert responded to a radio report of shots being discharged in the vicinity of the Post Office in Frederiksted, St. Croix.  The dispatcher also stated that there was a "man down" at the location.  (Herbert Aff. at ¶ 2, Dkt. No 39-1).

2.  Shortly thereafter, Sergeant Herbert arrived at the scene and observed a deceased male lying on the ground who had sustained several gunshots.  *Id*. at ¶ 3(b)-(d). The victim was identified by his father as Jamali Allick.  *Id.* at ¶ 3(f).  Several days later, the Medical Examiner determined that the cause of death was homicide.  *Id.* at ¶ 3(n).

3.  At the crime scene, forensic officers discovered live .45 caliber rounds and several spent .223 and 7.62 x 39 caliber cartridges. *Id.* at ¶ 3(e).  Sgt. Herbert knew from his experience as a law enforcement officer that 7.62 x 3.9 and .223 caliber rounds are used in AK-47s, AR-15s and other semi-automatic rifles. *Id.* at ¶ 3(q).

4.  While at the crime scene on the night of the shooting, an individual approached Sgt. Herbert and informed him that "DMX" and "Uncle Roy" committed the crime and "came

---

[1]    The Court bases the background factual discussion in this section on the record established at the suppression hearings and affidavits and documents accompanying the parties' filings relating to the Suppression Motion. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[2]    Defendant Henry was originally charged with the gun crimes at issue in this case by information filed on March 29, 2011, in Criminal Case No. 2011-06.  (*See* Crim. Case No. 2011-6, Dkt. No. 1).  On November 15, 2011, Defendant Henry was charged by indictment in this action, and the case styled Crim. Case No. 2011-6 was dismissed on motion by the Government. (*See* Crim. Case No. 2011-6, Dkt. No. 212).  On November 18, 2011, the Magistrate Judge entered an Order in this case that all discovery produced in Crim. Case No. 2011-06 is deemed to have been produced in this action.  (Crim. Case No. 2011-30, Dkt. No. 6).

by in a jeep." The individual further stated that he did not wish to get involved. *Id*. at ¶ 3(g).

5. At the crime scene, other individuals stated that they started running because they saw an individual dressed in brown or black military clothing, wearing what appeared to be a bullet proof vest, and holding a large weapon in his hand. *Id*. at ¶ 3(h).

6. The following day, Sgt. Herbert canvassed the crime scene and spoke to a witness who stated that, after the shooting, he/she observed an individual in military clothing with a large rifle in his hand get into the back of what appeared to be a black jeep with a rear mounted spare tire. *Id*. at ¶ 3(i).

7. Immediately following the incident, the VIPD Criminal Investigation Bureau received numerous "Crime Stoppers" tips implicating "DMX/X-Man," "Uncle Roy," and "Bugzy" in the shooting of Jamali Allick. The Crime Stopper tips also indicated that Dwayne Woodrup a/k/a DMX/X-Man resides and "hangs out" at Apartment 195. The Crime Stopper information about where Dwayne Woodrup resides and hangs out was consistent with information learned by Sgt. Herbert from prior investigations. *Id*. at ¶ 3(j)-(k).

8. From prior investigations, Sgt. Herbert knew that DMX/X-Man's real name is Dwayne Woodrup; Uncle Roy's real name is Roy Henry, Jr.; and Bugzy's real name is Levar Pogson. Sgt. Herbert's prior investigation also revealed that Woodrup, Henry and Pogson are associates of a gang called the "Kennedy Real Killers" and that this gang is rivals with other gangs in the territory. *Id*. at ¶ 3(j).

9. During the investigation into the murder of Jamali Allick, Sgt. Herbert received information from associates of Allick and Woodrup that "the two rival groups are preparing for a feud." *Id*. at ¶ 3(m).

10. On February 18, 2011, Sgt. Herbert learned from a Federal Bureau of Investigation ("FBI") Agent that a Confidential Informant ("CI") had informed the FBI that he/she observed an AK-47 rifle, leaning on the living room wall next to a couch by the living room door, and four handguns and drugs on a table in the same living room at Apartment 195. The FBI Agent further informed Sgt. Herbert that the CI had also observed several male individuals going in and out of Apartment 195 with guns at their waists. *Id*. at ¶ 3(o).

11. Apartment 195 is maintained by Dwayne Woodrup's family. Dwayne Woodrup, Roy Henry and Levar Pogson hang out at Building 31 with others and sell drugs from there. (*Id*. ¶ 3(p)). Dwayne Woodrup stays at Apartment 195. *Id*. at ¶ 3(x).

12. Dwayne Woodrup also resides with family members at No. 398 Castle Burke in Fredericksted. *Id*. at ¶ 3(x).

13. While conducting registration checks and other surveillance to determine the vehicles that Dwayne Woodrup and his family operate, Sgt. Herbert learned that Woodrup's mother, Sylvia Cornelius, owns and operates a 1998 dark green Toyota RAV4 with a rear mounted spare tire.  The RAV4 was photographed outside the family residence.  *Id*. at ¶ 3(r).

14. On February 20, 2011, Sgt. Herbert showed the picture of the RAV4 to the witness who had previously stated that after the shooting he/she had seen an individual get into the back of what appeared to be a jeep with a rear mounted tire.  The witness confirmed that the vehicle in the picture was similar in type and shape to the vehicle that he/she saw on the night of the homicide, but could not determine whether the color was the same because it was dark outside on the night of the homicide.  *Id*. at ¶ 3(s).

15. On February 21, 2011, the VIPD firearms bureau confirmed that Dwayne Woodrup, Roy Henry, and Levar Pogson are not authorized to possess firearms or ammunition in the United States Virgin Islands.  *Id*. ¶ at 3(t).

16. Sgt. Herbert knows from his experience and training that persons participating in violent crimes tend to hide evidence of such crimes in and around the physical surroundings of their homes, their families' homes and vehicles.  (*Id*. ¶ 3(w).

### B.  The Suppression Hearing

At the April 10, 2012 suppression hearing, Officer Ramos of the VIPD testified as follows:  At approximately 1:00 a.m. on February 25, 2011, he and several VIPD officers assembled outside Apartment 195 in preparation for execution of the search warrant issued by Judge Donahue on February 23, 2011.  Officer Jason Vivieros, who was standing directly outside the door to Apartment 195, knocked three times and announced "Police. Search warrant!"  After waiting approximately 15-20 seconds and hearing no response, Officer Vivieros used a battering ram to force the door open.

Officer Vivieros, who was holding a "ballistic shield" in one hand and his service weapon in the other, led the officers into the apartment.  Through the shield's 6 X 10 inch window, Ramos immediately observed an individual, later identified as Defendant Henry, sitting on a couch and pointing a black revolver away from the door.  Ramos testified that Defendant

4

Henry appeared to be showing the revolver to an individual sitting to Henry's immediate left. Officer Ramos ordered Henry to drop the weapon, but Henry did not respond.  Ramos repeated the command, and Henry dropped the weapon into his lap, and it then slid onto the floor.[3]  Henry and the individual sitting next to him, later identified as Mario Felix, were detained.  During the ensuing search of the apartment, VIPD officers discovered crack and powder cocaine, marijuana, a digital scale, marijuana packaging material, a .40 caliber firearm and ammunition, various loaded firearm magazines, gun cleaning supplies, two "imitation" body vests, and several thousand dollars in U.S. currency.  Two other individuals, Dwayne Woodrup and Levar Pogson, were asleep in rear bedrooms in Apartment 195 at the time of the entry, and were also arrested following the search.[4]

The Government further introduced evidence showing that, in February 2011, Apartment 195 was rented by Renise Woodrup James, who is the sister of Dwayne Woodrup.  According to James' Grand Jury testimony in this matter, no one lived at Apartment 195 in February 2011, but she continued paying rent on the apartment and, at some point, provided keys to Woodrup and Pogson.  (*See* March 15, 2011 Grand Jury Testimony, Gov. Ex. 2 at 2-9).[5]  She testified that Dwayne Woodrup and Defendant Henry have been friends since they were children.

---

[3]      Ramos testified that, upon entry into the apartment, he could smell marijuana, and that based on this odor and Henry's lethargic reaction to their entry, he believed that Henry was under the influence of marijuana at the time of the entry.

[4]      Dwayne Woodrup was a defendant in Crim. Case. No. 2011-06, until his dismissal on motion of the Government on November 11, 2011.  (Crim. Case No. 2011-06, Dkt. No. 212). Pogson and Felix were charged with possession of a firearm and drugs by indictment in Crim. Case No. 2011-17.

[5]      At the hearing in this matter, Ms. James claimed that she could not recall any of the facts to which she testified at the Grand Jury proceedings.

Defendant Henry's mother, Coleen Henry, testified that in February 2011, Henry was living with her at 178 Richmond, but that he occasionally spent some nights out. The evidence also showed that after Henry was arrested, he informed police that his address was 178 Richmond. (*See* Feb. 25, 2011 Arrest Report, Gov. Ex. 1)

According to a signed statement dated June 18, 2011, made by Pogson to Sergeant Herbert, which was received into evidence at the suppression hearing, on February 25, 2011, Pogson was watching a basketball game at Apartment 195, and Defendant Henry and Felix came to Apartment 195 to "visit" him. (*See* June 18, 2011 Statement, Gov. Ex. 3). Pogson sold some marijuana to Felix, and after smoking some marijuana, Pogson went into one of the bedrooms and fell asleep. *Id.*

## II.   DISCUSSION

Defendant Henry seeks to suppress the firearm allegedly found on the floor by his feet and the VIPD's observation that he was allegedly holding a firearm at the time that police entered Apartment 195. Defendant's Motion to Suppress challenges multiple aspects of the search, including: 1) whether the Herbert Affidavit provided sufficient probable cause for the issuance of the Search Warrant and whether the information in the warrant was stale; 2) whether there was sufficient "good cause" for a nighttime entry; and 3) whether the VIPD violated the "knock and announce" requirement before entering Apartment 195.

The Government maintains that Defendant's challenges are meritless and further argues that Defendant lacked a reasonable expectation of privacy at Apartment 195 at the time of the search, and therefore lacks "standing" to contest the search.

## A.  Defendant's "Standing" to Challenge the Search

### 1.  Applicable Legal Principles

"To invoke the Fourth Amendment's exclusionary rule, a defendant must demonstrate that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) (citing *Rakas v. Illinois*, 439 U.S. 128, 132-133 (1978)); *see also United States v. Baker*, 221 F.3d 438, 441 (3d Cir. 2000) ("Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted." (quoting *Rakas*, 439 U.S. at 133-134)).

"Determining whether a plaintiff has standing to challenge a search equates to determining whether the plaintiff has a reasonable expectation of privacy in the property searched." *United States v. Varlack Ventures, Inc.,* 149 F.3d 212, 215 (3d Cir. 1998) (citing *Rakas,* 439 U.S. at 143).  "The standing inquiry, in the Fourth Amendment context, is shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated." *Stearn*, 597 F.3d at 551 (citation omitted).  Standing to challenge a search requires that the party challenging the search have both an objectively and subjectively reasonable expectation of privacy in the property searched.  *Baker*, 221 F.3d at 441 (citing *Rakas,* 439 U.S. at 143 and *California v. Greenwood,* 486 U.S. 35, 39, 108 (1988)).  In other words, the Defendant must actually believe that he has an expectation of privacy, and this expectation must be the kind that "society is prepared to recognize as reasonable." *Rakas*, 439 U.S. at 143, n. 12.  The burden to demonstrate an expectation of privacy is on the party asserting the violation.  *Rakas,* 439 U.S. at 132, n.1; *Stearn*, 597 F.3d at 551 ("[T]he proponent of a motion to suppress 'bears the burden of proving not only that the search . . . was illegal, but also that he had a legitimate expectation of privacy in [the place searched]." (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980))).

In *Minnesota v. Olson*, 495 U.S. 91 (1990), the Supreme Court held that a party's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Id.* at 96-97. However, in *Minnesota v. Carter*, 525 U.S. 83 (1998), the Supreme Court clarified that "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Id.* at 91. In line with these cases, the Third Circuit has distinguished between a "short-term guest" and an overnight guest:

> It is settled law that if the police illegally enter a house and search it, the owner or tenant of the house, or any long-term guests, may suppress evidence found during the search. Short-term guests, however, have no expectation of privacy in the house and therefore cannot suppress the fruits of the illegal search . . . [O]nly the owner, tenant, or long-term guests could suppress evidence found during the search. Short-term guests would face the full evidentiary weight of any evidence discovered.

*United States v. Mosley*, 454 F.3d 249, 259 (3d Cir. 2006) (citing *Olson*, 495 U.S. at 91).

To establish oneself as an overnight guest, a party must present evidence that they were more than a casual visitor. *See, e.g., United States v. Berryhill*, 352 F.3d 315, 317 (6th Cir. 2003) ("[A] casual, transient visitor does not have a reasonable expectation of privacy in his host's home."); *United States v. Torres*, 162 F.3d 6, 10 (1st Cir. 1998) ("Torres was nothing more than a casual visitor in the apartment, and, as such, had no reasonable expectation of privacy."); *Terry v. Martin*, 120 F.3d 661, 663–64 (7th Cir. 1997) (distinguishing short-term guest from the overnight guest's presumptively reasonable expectation of privacy set out in *Olsen*).

In determining whether a party is an "overnight guest," relevant factors that courts have considered include whether the party actually spent the night at the residence; had access to the residence, such as a key; had control or dominion over the residence; and stored possessions at the residence. *See United States v. Pollard,* 215 F.3d 643, 647-48 (6th Cir. 2000) (defendant had

reasonable expectation of privacy in premises where he "had been staying . . . earlier in the week . . . kept some personal belongings in a closet in the living room," and was permitted to be in home while owners were absent);  *United States v. Davis*, 932 F.2d 752, 756–57 (9th Cir. 1991) (where defendant had key to apartment, could come and go freely, and stored items in an apartment, he had a reasonable expectation of privacy); *Nieves v. New York City Police Dept.*, 716 F. Supp. 2d 299, 307 (S.D.N.Y. 2010) (defendant who "had been friends with the Apartment's owner for several years, spent the night in the Apartment about five times a month, had a key to the Apartment, kept personal items there, and was the sole occupant at the time the officers arrived at the Apartment" had reasonable expectation of privacy in Apartment); *cf Villarreal v. State*, 935 S.W.2d 134, 139 (Tex. Cr. App. 1996) (no expectation of privacy when there was "no evidence that appellant had a property or possessory interest in, or unrestricted access to, the [] residence. Nor was there any evidence that appellant had dominion or control over the residence, or the right to exclude others. Nor even was there any evidence that appellant intended to stay overnight.").

## 2.  Analysis

Defendant Henry claims that he had a reasonable expectation of privacy based on his status an "overnight guest" or "social guest."  Defendant Henry identifies several facts in support of his claim that he had a reasonable expectation of privacy at the time of the search: 1) he was in Apartment 195 at a late hour of the night; 2) when police encountered him he was in a "subconscious" state (because he may have been smoking marijuana); 3) he was in the apartment watching a basketball game on television with the permission of the tenants; 4) he "periodically" hangs out at Apartment 195: and 5) he has a friendship with the alleged tenants.  (Dkt. No. 77 at 2-3).

When viewed in their totality, these facts establish only that Defendant was a "short-term guest" or a "casual visitor" at Apartment 195, not an overnight guest.  First, the Supreme Court has repeatedly indicated that the purpose of the defendant's presence on the premises— particularly whether they intended or were invited to spend the night—is highly relevant to the reasonableness of a claimed expectation of privacy.  *See Carter*, 525 U.S. at 88-91 (holding that defendants had no expectation of privacy in premises owned by another because they were there for "purely commercial" reasons); *Olson*, 495 U.S. at 99 (overnight guest has a reasonable expectation of privacy when he or she "*seek[s] out another private place to sleep*, whether it be a hotel room, or the home of a friend.") (emphasis added).  Here, Defendant Henry has presented no evidence that he was at Apartment 195 to spend the night.  To the contrary, the evidence indicates that he was there to watch a basketball game.  This does not support his claim of an expectation of privacy.  *See Villarreal*, 935 S.W.2d at 139 (defendant not an overnight guest because, in part, there was no "evidence that appellant intended to stay overnight."); *cf United States v. Rodriguez,* 2010 WL 1485704, at *3 (M.D. Pa. Apr. 12, 2010) (evidence that defendant "had gone to bed in the residence at approximately 11:30 p.m. the night before . . . [and] answered the door [at 10:30 a.m.] wearing a white tank top and shorts, [appearing] that he had just awakened" sufficient to demonstrate that he was an overnight guest); *United States v. Fitzgerald*, 2006 WL 1453108, at *1 (W.D. Pa. Mar. 15, 2006) (defendant, who "fell asleep in a living room chair, and then retired to the master bedroom where he subsequently was joined by Cheri Carter . . . the leaseholder and occupant of the [apartment] . . . had sex with Cheri Carter, and then went to sleep until the two awoke to the knocking of the local officers" was an "overnight guest" for Fourth Amendment purposes).

Second, unlike cases finding that a visitor had an expectation of privacy because they were an "overnight guest," Defendant presented no evidence that he brought with him a change of clothes, a toothbrush, or other accoutrements associated with spending the night away from home, or that he stored any possessions at Apartment 195. *See United States v. King*, 364 F. App'x 781, 785-86 (3d Cir. 2010) (upholding district court's finding that defendant's occasional presence at apartment, with no evidence of clothes, belongings or overnight bags, insufficient to establish status as overnight guest); *United States v. Berryhill*, 352 F.3d 315, 317 (6th Cir. 2003) ("Berryhill lacked any of the items one would expect an overnight guest to have with him. He carried no clothes or toothbrush . . . . The district court did not commit clear error in determining that Berryhill was not an overnight guest."); *United States v. Armenta*, 69 F.3d 304, 308-309 (9th Cir. 1995) ("Armenta had only a wallet and two other documents in the house, but no clothing or other indicia that he was even temporarily living or staying there. He also took no precautions to ensure his own privacy in the house. Armenta's situation does not suggest an "overnight guest" . . . of the sort envisioned by the Supreme Court in *Olson*."); *United States v. McNeal*, 735 F. Supp. 738, 742 (N.D. Ohio 1990) (finding no expectation of privacy in apartment when defendant "had no clothes, no toothbrush, nothing on his person or in the apartment that would indicate that he intended to spend the night in question in [the] apartment, nothing that would indicate that he was more than a casual, transient visitor on that night."); *cf Pollard,* 215 F.3d at 647-48 (defendant had reasonable expectation of privacy in premises where he "had been staying . . . earlier in the week . . . and kept some personal belongings in a closet in the living room.").

Third, Henry's mere presence at Apartment 195 after midnight with the permission of a tenant, does not make him an "overnight" guest.  Unlike the fairy tale of *Cinderella*, midnight has no magical properties in the Fourth Amendment context and does not transform a visitor into

11

an "overnight guest."  *See Gouldsby v. State*, 202 S.W.3d 329, 335 (Tex. Ct. App. 2006) (rejecting argument that a party has an expectation of privacy because they were "a legally invited guest on the premises at almost midnight").  As discussed above, the reasonableness of Defendant's claimed expectation of privacy is informed by the purpose of his visit.[6]  While the late hour of his visit, together with other factors might, in other circumstances, suggest an overnight stay, the evidence produced by Defendant Henry shows only that he was at Apartment 195 to watch a basketball game, not to sleep.[7]

Finally, Defendant's contention that he was a "social guest," and therefore had a reasonable expectation of privacy also fails.  In support of this argument, Defendant cites *United States v. Thomas*, 372 F.3d 1173 (10th Cir. 2004), and relies on his alleged longstanding friendship with Dwayne Woodrup, a tenant at Apartment 195.  In *Thomas*, the Tenth Circuit noted that "we have held that even social guests who do not stay the night have a reasonable

---

[6]   In modern society, guests may come over late at night, without the *expectation* that they will remain overnight.  For example, guests at a late night party may be present with the host's permission, but nonetheless lack a reasonable expectation of privacy.  *See, e.g., State v. Couillard,* 641 N.W.2d 298, 300 (Minn. Ct. App. 2002) (affirming trial court's finding that "as merely a party guest, Couillard does not have standing to contest the search of the residence"); *United States v. Maddox*, 944 F.2d 1223, 1234 (6th Cir. 1991) ("[A] guest at a party does not have a reasonable expectation of privacy in items found in the house at which the party occurs.").

[7]   For this same reason, Henry's argument that he had a reasonable expectation of privacy because he may have been smoking marijuana, and was thus in a "subconscious" state, and was "vulnerable . . . [and] unable to monitor his safety or the safety of his belongings" also fails. (Dkt. No. 77 at 12).  The evidence shows that he went to Apartment 195 to "visit" Pogson and watch a basketball game.  He was "vulnerable," if at all, not because he had sought a place to sleep and entrusted his safety to his host, but because he may have been smoking marijuana with another visitor.  Defendant's argument essentially transmutes drug-induced inebriation and incapacitation into an expectation of privacy—a leap unsupported by the expectation of privacy concepts formulated by the Supreme Court.  *See Nadell v. Las Vegas Metropolitan Police Dept.*, 268 F.3d 924, 928 (9th Cir. 2001) (finding that plaintiff, who had become inebriated and fallen asleep in guest bedroom, lacked reasonable expectation of privacy because "she was merely present with the consent of the householder and had formed no intention to remain overnight— nor, indeed, longer than was necessary to regain sufficient sobriety to drive.")

expectation of privacy in the host's home and may therefore challenge a search of the home on Fourth Amendment grounds."  372 F.3d at 1176 (citing *United States v. Rhiger*, 315 F.3d 1283 (10th Cir. 2003)).  However, Defendant's reliance on *Thomas*, does not aid his cause.  First, Defendant has not demonstrated that he is a "social guest" within the meaning of *Thomas*.  In *Thomas*, the defendant "testified that he was there as a social guest to celebrate New Year's Eve [and] that he planned to spend the night there and that his plans were "okay" with his aunt and uncle."  *Id*.  Here, as discussed above, there is no evidence that Defendant Henry had any plans to stay overnight at Apartment 195, or that he had discussed these plans with Woodrup or Pogson, and received their consent.  Further, in *Rhiger,* the case relied on by *Thomas,* the Tenth Circuit found that the defendant had a reasonable expectation of privacy as a "social guest," based on evidence that, prior to the search, the defendant had recently "stayed overnight at [the] residence . . . . [and] on the day the federal agents searched the [] home, he had entered the house in [the host's] absence and retired to [the host's] bedroom to take a nap."  *Rhiger*, 315 F.3d at 1286.  Here, there is no similar evidence.

In any event, notwithstanding the Tenth Circuit's rulings regarding the standing of a "social guest" to make a Fourth Amendment challenge, the Third Circuit stated in *Mosley* that "only the owner, tenant, or long-term guests could suppress evidence found during the search. Short-term guests would face the full evidentiary weight of any evidence discovered."  Because the evidence supports the conclusion that Defendant was nothing more than a "short-term guest," he "face[s] the full evidentiary weight of any evidence discovered."  *Id.*[8]

---

[8]     In light of *Mosley*, to the extent that the Tenth Circuit's rulings are to the contrary, they are of no import here.

In view of the foregoing, Defendant has failed to show that he had a reasonable expectation of privacy in Apartment 195 at the time of the search.  Accordingly, his challenge to any aspect of that search must fail.  *Stearn*, 597 F.3d at 551.

### B.  Probable Cause for the Issuance of the Search Warrant

Assuming *arguendo* that Defendant had demonstrated a reasonable expectation of privacy at Apartment 195 on the night of the search sufficient to allow him to contest the search, his challenge would still fail.

#### 1.  Applicable Legal Principles

A judicial officer may issue a search warrant only if he or she concludes that "based on a totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Bond*, 581 F.3d 128, 139 (3d Cir. 2009) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  "[A] warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause." *Franks v. Delaware*, 438 U.S. 154, 165 (1978).  However, "a magistrate may issue a search warrant even without direct evidence. Probable cause can be, and often is, inferred from the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [evidence]." *Stearn*, 597 F.3d at 554 (citations and internal quotations omitted).  "[A]n affidavit filed in support of an application for a search warrant is to be read in its entirety, with the focus on what the affidavit includes, not what is missing." *United States v. Miknevich*, 638 F.3d 178, 184 (3d Cir. 2011).

Because of "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant . . . [a] magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236; *see also United States v. Ritter*, 416 F.3d 256, 263

(3d Cir. 2005) ("[T]he conclusions of a neutral magistrate regarding probable cause are entitled to a great deal of deference by a reviewing court, and the temptation to second-guess those conclusions should be avoided.") (citation omitted). A district court should not "merely rubber stamp a magistrate's conclusions" but must also "heed the Supreme Court's direction that 'doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *Stearn*, 597 F.3d at 554 (citing *Gates*, 462 U.S. at 237 n.10). Accordingly, the test is not "whether probable cause actually existed, but only whether there was a 'substantial basis' for finding probable cause." *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001).

## 2.   Analysis

Defendant argues that the Herbert Affidavit contained a "paucity of information to establish probable cause to believe that evidence of a crime would be located within the home and . . . fail[ed] to establish the veracity of the informant or corroborate his information."  (Dkt. No. 39 at 6).  Under the totality of the circumstances, however, the Court finds that there was a substantial basis for the Superior Court judge to conclude that there was probable cause that evidence of a crime would be found at Apartment 195.   Several factors contribute to the existence of probable cause for the search.  First, several witnesses provided information linking Dwayne Woodrup, whom VIPD knew lived at Apartment 195, to the murder of Jamili Allick. On the night of the homicide, a reluctant witness informed Sgt. Herbert that "DMX" and "Uncle Roy" had "committed the crime" and that they "came by in a jeep."  And shortly after the shooting, the VIPD received numerous Crime Stoppers tips implicating Dwayne Woodrup, Roy Henry and Levar Pogson in the murder of Allick.

Defendant argues that this information cannot be used to support a probable cause finding because the affidavit fails to demonstrate that the witnesses and tipsters were credible or reliable. *See Gates*, 462 U.S. at 238-39 (when determining whether a tip supports probable cause, courts should consider the tipster's reliability, veracity, and basis of knowledge).  The information provided by the reluctant witness was partially corroborated by another witness interviewed by Sgt. Herbert the following day, who stated that after the shooting, he/she observed an individual holding a firearm flee into "what appeared to be a black jeep."   Because the jeep detail provided by the reluctant witness was corroborated by the statement of an independent witness, the Superior Court judge had a sufficient basis upon which to include the reluctant witness's statement that DMX and Uncle Roy "had committed the crime" in his probable cause analysis. *See Stearn*, 597 F.3d at 556 (noting that police corroboration of an informant's tip can "provide a 'substantial basis for crediting the hearsay' because it 'reduce[s] the chances of a reckless or prevaricating tale.'") (quoting *Gates*, 462 U.S. at 244-45); *United States v. Johnson*, 592 F.3d 442, 50 (3d Cir. 2010) (finding that corroboration of location, color, and distinguishing feature of taxicab provided by tipster "enhanced the reliability of the information that she provided to the police"); *United States v. Garvey*, 2010 WL 3724696, at *4 (D.V.I. Sept. 17, 2010) ("[T]he Supreme Court has explained that partial corroboration of a tip helps to establish an informant's veracity because if 'an informant is right about some things, he is more probably right about other facts.'") (quoting *Gates*, 462 U.S. at 244).

Similarly, in addition to implicating Defendant Henry in the shooting of Allick, the Crime Stopper tipsters also stated that Dwayne Woodrup resided and hung out at Apartment 195. From his prior investigation involving Dwayne Woodrup, Sgt. Herbert knew that this was accurate.  While the information concerning where Woodrup resides is an "innocent" detail, its

16

corroboration nonetheless enhances the reliability of the Crime Stopper tipsters. *See Stearn*, 597 F.3d at 556 (finding fact that informant "demonstrated knowledge of [suspect's] home and cars" relevant to reliability determination); *Ritter*, 416 F.3d at 272 (Smith, J., dissenting in part and concurring in part) ("The police corroboration of the anonymous tip's innocent details, the cases teach, bolsters the veracity and reliability of the tip, as well as suggests that the tipster is a trusted intimate of the target, and thus may be privy to inside information concerning the target's alleged lawbreaking."); *United States v. Dennis*, 2011 WL 3515903, at *3 (D.V.I. Aug. 11, 2011) (finding that corroboration of portion of confidential informant's tip regarding where suspects resided was probative of informant's familiarity with the suspects).

Second, an eyewitness provided a link between the vehicle owned by Woodrup's mother and the homicide, further corroborating the information provided by the reluctant witness and the Crime Stopper tipsters. The day after the homicide, a witness informed Sgt. Herbert that he/she saw an individual dressed in military clothing with a gun flee the scene of the shooting in what appeared to be a black colored jeep with a rear mounted tire.[9] Two weeks after the shooting, Sgt. Herbert showed a picture of a dark green RAV4 owned by Woodrup's mother to the witness. The witness confirmed that it was similar in type and shape to the vehicle that he/she saw on the night of the shooting, but was unable to confirm that the color was the same because it was dark outside on the night of the shooting.[10] From the information provided by this witness

---

[9]   Notably, the jeep detail was consistent with the statement of the reluctant witness. Additionally, the military clothing detail was consistent with the information provided by other individuals on the night of the shooting who also claimed that they saw an individual dressed in military clothing holding a gun.

[10]   This witness was not "anonymous," because the police were able to get in contact with him/her two weeks after the shooting. *Cf. United States v. Roberson*, 90 F.3d 75, 75-76 (3d Cir. 1996) (911 call from unidentified caller when "911 operator had no information as to the reliability of the caller or the source of this information" was an "anonymous" tipster). The fact

and the other information contained in the Herbert Affidavit, it was reasonable for the Superior Court judge to infer that the dark green RAV4 owned by Dwayne Woodrup's mother was the same vehicle seen at the crime scene on the night of the shooting by the two witnesses. And, because the Herbert Affidavit stated that Woodrup resided with family members at "the family residence"—398 Castle Burke (where the RAV4 was photographed by Sgt. Herbert)—it was also reasonable for the Superior Court judge to infer that Dwayne Woodrup had access to his mother's vehicle. *See Miknevich*, 638 F.3d at 184.

Third, a confidential informant informed the FBI that he/she had observed an AK-47 rifle, handguns and drugs in the living room of Apartment 195 as well as individuals with guns coming and going from Apartment 195. "A magistrate may issue a warrant relying primarily or in part upon the statements of a confidential informant, so long as the totality of the circumstances gives rise to probable cause." *Stearn*, 597 F.3d at 555. To determine whether a tip provides probable cause, courts consider the tipster's reliability, veracity, and basis of knowledge. *Id.* (citing *Gates*, 462 U.S. at 238-39). A tipster need not score strongly in all of these "elements," so long as "a deficiency in one [element] [is] compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Stearn*, 597 F.3d at 555 (quoting *Gates*, 462 U.S. at 233).

The CI's observation of an AK-47 at Apartment 195 is consistent with the spent 7.62 x 39 casings found at the crime scene—which, according to Sgt. Herbert, are used in AK-47s— witnesses' statements that, after the shooting, they saw an individual flee the scene holding either

---

that police know the witness and are able to potentially take action if the witness is found to be fabricating the story indicates reliability. *See United States v. Brown*, 448 F.3d 239, 249 (3d Cir. 2006) (holding that when "[t]he person providing the tip can be held responsible if her allegations turn out to be fabricated" indicates reliability) (citation omitted).

a "large weapon" or a "large rifle," and the other witness and tipster statements implicating Woodrup in the shooting death of Allick.  Furthermore, the CI's observations of "four additional handguns" and that several male individuals went in and out of Apartment 195 with "guns on their waist" were consistent with the information provided to Sgt. Herbert by associates of Woodup and Allick that "the two rival groups are preparing for a feud."  This information provides a nexus between Apartment 195 and the things to be searched for as specified in the Herbert Affidavit.

Additionally, the level of detail provided by the CI, including precisely where inside Apartment 195 he observed the AK-47—"leaning on the living room wall next to a couch by the living room door"—adds to the reliability of the CI.  *Johnson*, 592 F.3d at 449-50 (fact that tipster provided "eyewitness observations" enhanced reliability of tip) (citing *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000)); *United States v. Torres*, 534 F.3d 207, 211-12 (3d Cir. 2008) (fact that "tipster was an eyewitness who had recently witnessed the alleged criminal activity" and provided a "straightforward and thorough description" weighed in favor of reliability) (citing *Brown*, 448 F.3d at 249-50); *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002) (finding that the "inside nature of the information" provided by tipster weighed in favor of his reliability). Thus, while the CI tip alone is insufficient to support a search warrant, the tip is consistent enough with, and sufficiently corroborated by, the other information in the Herbert Affidavit to provide a reliable indication that evidence of a crime would be found at Apartment 195.[11]

---

[11]      Further, in his affidavit, Sgt. Herbert states that, in his experience as a law enforcement officer, those who commit violent crimes tend to store evidence of those crimes in and around where they and their families reside.  The Superior Court judge could have permissibly relied on this statement in determining that there was probable cause to search Apartment 195.  *See United*

When viewed in its entirety—as it must in review of a search warrant—the information provided in the Herbert Affidavit was sufficient to support a finding of probable cause to search Apartment 195.

>    3.   Staleness

Defendant Henry also argues that the information provided in the Herbert Affidavit failed to support a finding of probable cause on the date the warrant was issued because the information was "stale."  (Dkt. No. 39 at 5-6).  An application for a search warrant must "establish that certain items are probably located at the present time in a certain place. It is not enough that the items may have been at the specified location at some time in the past—there must be probable cause to believe that they are there when the warrant issues."  *United States v. Tehfe*, 722 F.2d 1114, 1119 (3d Cir. 1983) (citing 1 W. LAFAVE, SEARCH AND SEIZURE § 3.7(a) (1978)). "The age of the information supporting a warrant application is a factor in determining probable cause." *United States v. Vosburgh*, 602 F.3d 512, 528 (3d Cir. 2010) (citing *Harvey*, 2 F.3d at 1322) (internal brackets and quotations omitted).  If the information is too old or "stale," probable cause may no longer exist.  *Id.* (citing *United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002)).

To analyze a claim of staleness, a court does not "simply count the number of the days between the date of the alleged criminal activity and the date of the warrant," but "must also

States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000) ("The issuing judge or magistrate may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense."); *see also United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) ("If there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases."); *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) ("firearms[] are also the types of evidence likely to be kept in a suspect's residence.").

consider the nature of the crime and the type of evidence involved." *Id.* (quoting *Zimmerman*, 277 F.3d at 434) (internal quotation marks omitted); *see also Tehfe*, 722 F.2d at 1119 ("The likelihood that the evidence sought is still in place depends on a number of variables, such as the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched.").

The Court finds that the information contained in the Herbert Affidavit was not stale. First, the Herbert Affidavit states that the Crime Stopper tips were received "immediately following the incident." This is sufficient to demonstrate that they were relaying fresh information. Second, Sgt. Herbert's prior investigations concerning Defendant are only relevant insofar as they provide him with knowledge about where Defendant spends time and resides. Because people ordinarily reside in one place for an extended period of time, this type of information is less susceptible to becoming stale. Thus, the Superior Court judge did not need to know the precise date of those investigations. *See Tehfe*, 722 F.2d at 1119 (whether information is stale is largely a function of the nature of the information). Moreover, Sgt. Herbert's prior discovery that Woodrup resided at Apartment 195 was consistent with the information provided by the Crime Stopper tipsters. Accordingly, the Superior Court judge could reasonably have concluded that, as of the night of the homicide, Defendant was residing at Apartment 195.

Third, the information provided by the CI was not stale. It was relayed to Sgt. Herbert on February 18, 2011, only days after the homicide. The tip concerned the presence of an AK-47 and drugs at Apartment 195. AK-47 ammunition was found at the crime scene. The statements implicating Woodrup in the homicide combined with the observation of the AK-47 at Apartment 195 (the same type of gun used in the homicide) and the fact that the CI tip was relayed to Sgt. Herbert only days after the homicide allows for the reasonable inference that the CI had observed

the firearm at Apartment 195 in close enough temporal proximity to the homicide to make the information relevant.

Finally, the twenty-day period between the homicide and the Herbert Affidavit does not render the search warrant stale.  Four days before Sgt. Herbert signed his affidavit, the FBI informed Sgt. Herbert about the CI's observation of an AK-47, handguns, drugs, and armed individuals coming and going from Apartment 195.  Furthermore, sometime after the shooting, Sgt. Herbert learned that Woodrup's and Allick's "groups" were "preparing for a feud."  In view of: 1) the CI's observations of guns, drugs, and armed individuals at Apartment 195, 2) statements by individuals that Woodrup and his associates were responsible for the shooting, 3) post-shooting statements that Woodrup and his group were preparing for a feud with the victim's associates, 4) the discovery of three different types of bullets at the murder scene, and 5) witnesses' observations that a gunman was observed fleeing the crime scene in the back of a jeep matching the type and shape of that driven by Woodrup's mother, it was not unreasonable for the Superior Court judge to infer that Woodrup and his associates' preparations for a feud involved guns and ammunition and that such preparations were taking place at Apartment 195 sometime *after* the shooting of Allick.  *See United States v. Williams*, 124 F.3d 411, 421 (3d Cir. 1997) ("The fact that evidence of the suspected criminal activity continued up through the last weeks before the search strongly suggests that the information in the affidavit was not stale.").  In other words, the Superior Court judge had a substantial basis to find a "fair probability" that evidence of a crime would be found at Apartment 195 on February 23, 2011, the day that the warrant was issued.[12]  *See United States v. Yusuf*, 461 F.3d 374, 391 (3d Cir. 2006) ("[T]he mere passage of

---

[12]     Defendant asks the Court to consider the holding in *United States v. Charest*, 602 F.2d 1015, 1018 (1st Cir. 1979) that "[i]t is contrary to common sense and logic to expect a murderer

time does not render information in an affidavit stale where . . . the facts suggest that the activity is of a protracted and continuous nature . . . .") (citing *Tehfe*, 722 F.2d at 1119)); *United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005) ("[W]here the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance.").

Accordingly, the information contained in the Herbert Affidavit was sufficient to provide probable cause that evidence of a crime would be found at Apartment 195 at the time the Search Warrant was issued.

### C. "Good Cause" for Issuance of a Nighttime Warrant

Federal Rule of Criminal Procedure 41(e)(2)(A)(ii)  provides that a nighttime warrant may only be issued based on "good cause." Fed. R. Crim P. 41(e)(2)(A)(ii).  Defendant Henry argues that "the Government produced no evidence within the search warrant affidavit that would support a finding of good cause, to support a nighttime warrant."  (Dkt. No. 39 at 9).  The Court disagrees.

As indicated in the Herbert Affidavit, police were investigating a particularly violent murder, and had received information that assault weapons consistent with those used in the

---

to keep the murder weapon in his own premises for almost three weeks."  However, the *Charest* court itself recognized "that time is relative and must be measured by the circumstances of each case."  *Id*.  Crucially, in granting the motion to suppress, the *Charest* court emphasized that there was no link between the defendant's home and the murder weapon other than evidence that the defendant committed the shooting.  *Id*. at 1017.  Here, in contrast, aside from evidence that Woodrup and Henry were involved in the shooting of Allick, there was also evidence of the presence of firearms—including an AK-47 and several handguns— at Apartment 195, the place to be searched.

shooting were being stored at Apartment 195.  Additionally, police were informed that males with guns at their waist were seen leaving Apartment 195, and that the alleged murderers' victim's gangs were preparing for a feud.  Thus, the Herbert Affidavit laid a sufficient foundation that an incursion into Apartment 195 presented a substantial risk to officer safety and that there was therefore "good cause" for a nighttime warrant.  *See United States v. Buis*, 678 F. Supp. 2d 665, 674 (E.D. Tenn. 2009) (finding that nighttime execution of search warrant was permissible because "the police had substantial concerns over their safety to justify a night search").  Accordingly, Defendant's objection to the issuance of the warrant on the grounds that there was insufficient "good cause" for a nighttime search must fail.

### D.  Knock and Announce

The knock and announce rule requires police to announce their presence and provide residents an opportunity to open the door before entering a dwelling to execute a warrant. *See Wilson v. Arkansas*, 514 U.S. 927, 929 (1995).[13]  After knocking and announcing their presence, police must wait a "reasonable" amount of time, the length of which depends on the facts and circumstances known to the police at the time of the search.  *See United States v. Banks*, 540 U.S. 31, 39-40 (2003) (finding that 15-20 second wait was reasonable when police reasonably feared destruction of evidence).

In his Motion to Suppress, Defendant argues that "[t]o the extent that the Government claims that it did knock and announce, the reasonableness of the Government's conduct would be a fact intensive inquiry best answered at an evidentiary hearing."  (Dkt. No. 39 at 2-3).  At the

---

[13]     However, this requirement is "not necessary when circumstances presen[t] a threat of physical violence." *Hudson v. Michigan*, 547 U.S. 586, 589 (2006) (citations and internal quotations omitted).  For the same reasons that a nighttime warrant was appropriate, it is arguable that police were not required to knock and announce their presence before forcing their way into Apartment 195.

hearing on this matter, Officer Ramos testified that, just prior to the search, Officer Vivieros was standing directly outside the door to Apartment 195, knocked three times, and announced "Police. Search warrant!"  After waiting approximately 15-20 seconds and hearing no response, Officer Vivieros used a battering ram to gain entry into the apartment.  Defendant offered no evidence disputing these facts.  In light of the substantial safety risks presented by executing a search warrant on an apartment where multiple guns are suspected of being stored and from which people have been seen carrying firearms, a 15-20-second wait before making entry was reasonable.  *Banks*, 540 U.S. at 39-40; *see also United States v. Stropes*, 387 F.3d 766, 773 (8th Cir. 2004) ("[O]fficer safety is a clear concern and fifteen to twenty seconds is a sufficient time to wait before entering the home of a suspected drug dealer to search for multiple stolen firearms.");  *United States v. Nabors*, 901 F.2d 1351, 1354 (6th Cir. 1990) (no knock and announce violation when police waited only "moments" after announcing presence before forcing entry because of "the facts confronting the officers, including the threat to their own safety, the safety of those in the apartment, and the need to preserve narcotics evidence.")  Accordingly, Defendant's knock and announce challenge also fails.

### III.   CONCLUSION

For the reasons stated above, Defendant's Motion to Suppress and Supplemental Motion to Suppress must be denied.  An appropriate order accompanies this Memorandum Opinion.

Date: July 15, 2012                          _____/s/_____
                                             WILMA A. LEWIS
                                             District Judge